Milton Albert, J.
The above two claims were tried together as there were common questions of law and fact involved. No order of consolidation or joint trial was ever entered. A single decision will be made, but separate judgments will be entered.
The claimants, among them, owned 158.250± acres of land on the west side of Cold Spring Road in the Town of Coxsackie in Greene County. Located within their holdings was Bronk’s Lake, a man-made body of water, which covered 59± acres of land. Of the 158.250± acres, claimants Joseph T. and Virginia K. Garland owned 79.831± acres, of which 32± acres were covered by the lake. Claimants Louise H. and Henry Knaust, Jr., owned the 78.419± acres contiguous to the Garland property, of which 27± acres were covered by the lake. The dam that impounded the waters was located on the Garland property.
The State of New York, through its Commissioner and Department of Correction and pursuant to section 21 of the Correction Law, appropriated permanent easements over the entire 59±-acre lake for water supply purposes for use by the New York State Vocational Institution at West Coxsackie. The easements were 11 for the purpose of securing and diverting an adequate and wholesome supply of water * * * impounded above a minimum lake level set at 2.5 feet below the spillway elevation.” Additional permanent easements, totaling 0.676± acres were taken for a .right of way for water supply purposes which covered the dam, spillway and a water pipeline. Reserved to the claimants and their successors in the lake easements was “the right only to use the waters of Bronk’s Lake * * * for the following recreational uses: boating, -sailing, fishing, swimming and water skiing, also the right to draw water from the lake for household purposes, provided the exercise of such rights does not, in the opinion of the Commissioner of Correction acting for the State of New York, his successor and/or successors in office, interfere with or prevent the public use and exercise of easement rights hereinbefore described.”
*534 The Garlands’ claim is based upon Map 3, Parcel 4, Map 4, Parcels 5 and 6,. and Map 5, Parcel 7, all in Greene County, which covered a 32±-aere area of the lake and the right of way covering the dam, spillway, and water pipeline. The Knausts’ claim is based on Map 6, Parcel 8, in Greene County, which covered a 27±-acre area of the lake. The aforesaid maps and descriptions were filed in the office of the Clerk of Greene County on February 16, 1968.
The Garlands ’ claim was filed with the Clerk of the Court of Claims and the Attorney-General on January 16, 1969. The Knausts ’ claim was similarly filed on May 21,1969. Neither claim has been assigned or submitted to any other court or tribunal for audit or determination.
The court adopts the descriptions of the appropriated property as shown on the maps and descriptions filed in the Greene County Clerk’s office, copies of which are attached to the claims and same are incorporated herein by reference.
Claimants Joseph T. and Virginia K. Garland were the owners of their property by reason of a deed dated November 1, 1960 from Herman Knaust, grantor, to Joseph T. and Virginia K. Garland, grantees, recorded in the Greene County Clerk’s office on February 15, 1961, in Book 391 of Deeds at page 329. Claimants Louise H. and Henry Knaust, Jr., derive their title by reason of a deed dated December 22, 1959 from Knaust Brothers, Inc., grantor, to Henry Knaust, grantee, recorded in the Greene County Clerk’s office on December 24, 1959 in Book 381 of Deeds at page 584. Henry Knaust died and claimants Louise H. and Henry Knaust, Jr., qualified as executors under the will of Henry Knaust.
By the above-described deeds, each of the grantees enjoyed a right to use, in common with the other, the part of the lake not included in their conveyance, for recreational purposes. The conveyances provided also for common use of a driveway and for the common maintenance of the dam and of the lake level.
In addition to the lake, the parcels were improved with almost identical fine Adirondack-type cabin residences located between the lake and the highway. These residences were served by the common drive.
Although the claimants’ appraiser prepared two appraisals, he valued both holdings together and then apportioned the values and damages between the two.ownerships. He valued the land on a per acre basis and to this added an enhancement value for the lake. Based on an area of 158± acres (including the 59± acre area of the lake) and the per acre value of $125, he found *535 a land value of $19,750, to which he added a lake enhancement value of $275,000 and divided the total in half to arrive at a land and lake value of $147,500 for each ownership. For each of the parcels he valued the buildings at $29,850 and the improvements at $9,200 so that his before value for each of the two sets of clcámamis was $186,550. In the after situation, he valued 98.5± acres of land (exclusive of the lake) at $150 per acre for a total of $14,800, rounded, and found no change in the value of the buildings and improvements. However, he did not divide the after value equally as the Garlands ’ holdings are smaller. Hence, in the after situation, he allotted $7,073.25 to the Garlands and $7,724.85 to the Knausts. Nevertheless, he testified to a total damage of $280,200 which he divided equally, or $140,100 for each set of claimants.
An engineer produced by the claimants testified that based on his analysis of the work that he estimated was done to construct the dam and lake bottom, the present day cost thereof would be $354,010.
The State’s appraiser testified to a value of $600 per acre and found a higher value for the Knaust claim because of their larger holdings. For the Knaust claim, his land value for an 84± acre area was $50,400; and for a 71.4± acre area held by the Garlands, it was $42,840; the ground improvements for each parcel were the same, $1,000. He valued the Knaust’s building at $28,700 as it had a larger garage; the Garland’s building was valued at $27,840. Thus, the Knaust’s “before” value was $80,100 and the Garland’s $71,680.
In the “ after ” situation, he valued the land at $500 per acre for the Knausts and $450 per acre for the Garlands.
Thus, his value of a Knaust 84±-acre parcel after the taking was $42,000 for the land, $900 for the improvements, and $25,830 for the buildings. This gave him a damage amount of $11,370, of which $2,700 was direct damage for the permanent easement over the lake and $8,670 as consequential damage to the land and buildings; he deducted $485 -as a factor for dam maintenance and rounded his damage at $11,000.
The after value of a Garland 70±-acre parcel was testified by him to be $31,830 for the land, $900 for the improvements and $25,056 for the buildings. His damages for this parcel were $13,894, of which $5,100 was direct damage and $8,794 was consequential damage to the land and buildings; he deducted $485 here too, as a factor for dam maintenance and rounded the damages to $13,400.
The court viewed the property.
*536 After careful consideration of the testimony at the trial, the appraisals and exhibits in evidence, the demeanor of the witnesses, and the court’s view of the subject property, the court finds as follows:
1. The highest and best use of the properties, both before and after the appropriations, was for their present use, including homesites along their Cold Spring Road frontages, and a future potential for development of home or vacation sites in the 1 ‘ far side ’ ’ area west and northwest of the lake when it becomes economically feasible to extend necessary facilities thereto and to construct access roads thereto and bridges over the stream inlet and outlet of the lake.
2. The court notes that the takings here were permanent easements essentially with respect to the right in the State to draw water from the lake, to have access to the dam, spillway and water pipeline, “ to maintain, operate, rebuild * * * [the] earth dam, concrete spillway structure, water pipeline and appurtenances thereto ” (Map 4, Parcel 6), restricting the use of the lake to specified recreational uses, and restricting the drawing of water from the lake to household purposes.
Since the claimants ’ appraiser found no damage to the buildings and ground improvements as a result of these permanent easement takings and since the State’s appraiser found only approximately $3,000 of such damage for each set of claimants, the basic issue for the court to consider and adjudicate is the damage to the land (including the lake) caused by the State’s takings.
It appears to the court that a draw down of the level of the lake to 2% feet below the spillway would cause a recession of water from the high water shore lines of the lake. A similar result could occur during a season of drought and little precipitation. Thus, the State’s right could mean that the recession of water from the high water shore lines could occur more frequently than under natural conditions. Also to be noted is the right reserved by the State to “ maintain ” and 11 rebuild ” the dam and spillway structure. This could mean that in order for the State to preserve its water source, it would have to maintain, to make necessary repairs to, and even to rebuild the dam, thus relieving claimants of the burden of doing so.
The claimants’ appraiser approached this basic valuation issue in the before situation by valuing the land at $125 per acre (including the area covered by the lake) for a total of $19,750 and then by adding an enhancement value of $275,000 for the lake. Then, in the after situation, he viewed the State’s perma *537 nent easement takings as equivalent to a fee taking less ‘ ‘ the right to see, look at and enjoy any aesthetic or sylvan enhancement the appropriated area may render to the. remaining lands. The appropriation shall cause the remaining lands to be mountain acreage only with the visual enhancement of a small lake.” Thus, in the after situation, he almost completely discounted the presence of the lake and only valued the 98.5± remaining acres of land area at $150 per acre for a total of $14,800 rounded, with $25 per acre thereof being ascribed to the enhancement value provided by the ‘ ‘ aesthetic value of being able to see the lake from the remaining acreage.”
The court is unable to subscribe to this appraiser’s interpretation of the legal situation with respect to the ownership of the lake in the after situation. As the court views the legal situation, claimants are still the owners of the lake, with their ownership being subjected to the State’s permanent easement rights described in the first paragraph of this point 2 of the substantive portion of this decision. They and their successors in title can use the lake, as they have in the past, for the recreational purposes of boating, sailing, fishing, swimming and water skiing and they can draw water from the lake for household purposes as they have in the past so long as these do not interfere with or prevent the use and exercise of the easement rights of the State. Assuming the State were to draw down the lake’s level to 2.5 feet below the spillway, all of the above activities could still be done on the lake at its lowered level and without reasonable complaint of interference with the State ’s; easement rights (see lake depths on claimants’ Exhibit 16 in evidence). What may so be done is consistent with the highest and best use of the claimants’ properties in both the before and after situations.
In the before situation, the claimants’ appraiser’s enhancement value was based on a $125 per acre market data approach plus 55% of the cost of the Medway Reservoir of the Village of Coxsackie and on unidentified ‘ ‘ outside contractual and engineering help ”. Some support for this cost approach was provided by a value of water for sale estimate. Further support therefor was provided by the independent testimony of an engineer based on a cost approach. In the after situation, the claimants’ appraiser’s value was based on a market data approach with a $25 per acre enhancement of the land surrounding the lake, with such per acre figure not being based on a cost approach. Thus, in the before situation, his enhancement value for the lake was based on a type of cost approach supported by an engineer’s cost estimate and by a value of water for sale approach, whereas *538 in the after situation his enhancement value of the lake was based oh an acreage increment added to a market data acreage value of the “ dry ” land. This appears to assume that claimants do not own the lake in the after situation — with which assumption the court does not agree! Thus, the court does not agree that ■the value of the lake should he eliminated in the after situation except “ to see ” and “ look at.”
Translated into monetary figures, the claimants’ appraiser’s type of cost approach enhances the $125 per acre market data before value of the 98.5+ acres of “ dry ” land by almost $2,800 per acre because of the presence of the lake (in addition to his valuing the 59± acres under water at $125 per acre); in the after situation, he added to his basic $125 per acre market data value of 98.5+ acres of “ dry ” land a $25 per acre increment (not based on a cost approach) for enhancement attributable to the presence of the lake “ to see ” and “ look at.”
Since there is no change in highest and best use with respect to the before and after situations, and since the claimants’ appraiser utilized different methods to find his before and after values, the court must at this time make note of a basic appraisal rule which the court must follow and which recently was phrased as follows by the Appellate Division in Bronxville Palmer Ltd. v. State of New York (36 AD 2d 10, 14) : “ the ‘ before and after ’ process involves two appraisals and, where the highest and best use has not been affected by the taking, both appraisals must be made by identical methods ’ ’.
The court notes that the State’s appraiser utilized market data approaches for valuing the property as enhanced by the presence of the lake in both the before and after situations, with regard to the adverse effects of the State’s permanent easement rights in the after value.
Thus, having in mind the court’s inability to subscribe to the claimants’ appraiser’s interpretation of the legal situation with respect to the ownership of the lake in the after situation, the court finds that if it were to adopt the claimants’ appraiser’s market data plus cost type approach for finding before value, it would have no similar approach for finding after value because neither appraiser used a cost type approach in finding after value. Accordingly, the court is left with the market data approaches of the State’s appraiser in the before and after situations and the claimants’ appraiser’s market data approach in the after situation.
At this point, the court .notes that in both claims, the basic taking is not described as equivalent to a fee taking; rather in *539 the Garland claim, the claim is made in paragraph 2 thereof 1 ‘ for the permanent appropriation of water by the State for water supply purposes ’ ’ and in paragraph -8 thereof ‘ ‘ For permanent easement for securing and diverting water.” In the Knaust claim, the claim is made in paragraph 2 thereof “ for the permanent appropriation of water by the State of New York for water supply purposes ” and in paragraph 8 thereof “ For direct and indirect damages to the property of claimants caused by the appropriation and for the taking of the water.” Thus, the claims, as drafted, do not provide a foundation for the claimants’ appraiser’s view that in legal contemplation “ all of the rights granted by a bundle of rights in fee ownership have been removed or taken”, that any “rights granted unto the owner of the fee by the permanent easement are such that they are granted at the discretion of the Commission [sic] of Correction * * * and are removable or can be canceled ’ ’, and that 1 ‘ the only actual right remaining to the owner of the fee * * * is the right to see, look at and enjoy any aesthetic or sylvan enhancement the appropriated area may render to the remaining lands.”
Accordingly, the court finds (a) that claimants still own the lake, subject to the State’s easements for water supply, (b) that there are reserved to claimants exclusive recreational and household water rights, subject only to the State’s exercise of such easements, and (c) that in determining the damages sustained by the claimants, the court must rely on the market data approaches heretofore described. Thus, the court finds that the facts here do not fall within the rationale of Wolfe v. State of New York (22 N Y 2d 292, 295-296) as followed in Wayside Nurseries v. State of New York (36 A D 2d 212), nor within the rationale of Dillenbeck v. State of New York (193 Misc. 542, 545-546, affd. 275 App. Div. 871). This is because the instant taking still leaves the claimants with title to the lake and access thereto and with exclusive rights to use the lake for specified recreational and household water supply purposes, provided the exercise of such rights does not interfere with or prevent the exercise by the State of its easement rights to draw a wholesome supply of water from the lake by drawing down the level thereof to 2.5 feet below the spillway elevation. In short, the claimants have more dominion over the lake than does the State.
The court’s approach has in mind the decision in Jafeo Realty Corp. v. State of New York (18 A D 2d 74, affd. 14 N Y 2d 556) in that appropriate proceedings might have to be instituted by the claimants in the future in the event actions on behalf of the *540 State are taken hereafter which interfere with claimants’ rights to the lake as they exist after the State’s instant takings.
The court will find before and after fair market values based on market data approaches which will include appropriate consideration of the enhancement value of the lake in both situations (Canaday v. State of New York, 34 A D 2d 845). The court believes its valuation approach is consistent with what was done by the Appellate Division, Third Department, with respect to valuation of the dam in Frontier Town Props, v. State of New York (36 A D 2d 148, 155).
For the before situation, the court considered the possibility of valuing all the acreage, including the acreage under the lake, at $125 per acre as advanced by claimants’ appraiser, but had to reject this approach since such appraiser found the acreage under water to have no value in the after situation because of his view that the State’s takings were equivalent to fee takings as they related to the lake itself, which view the court has rejected. Therefore, there would be no range of testimony within which the court could make findings with respect to such acreage.
Thus, the court is left with the State’s appraiser’s approach wherein he valued all the land, including the land under water, at $600 per acre in the before situation as enhanced with Bronk’s Lake. With respect to the G-arland claim and their 79.831± acres, the court computes this to produce a before value of $47,900 rounded; with respect to the Knaust claim and their 78.419± acres, the court computes this to produce a before value of $47,050 rounded. The court finds these dollar amounts to have been the before fair market values of such lands, respectively. Based on a consideration of 99± acres of “dry” land (i.e. land not under the lake), these dollar amounts compute out to $950+ per “ dry ” acre.
As to after value, the court rejects the claimants’ appraiser’s view that the “ dry ” land in the after situation had a value of only $150 per acre, which valuation was based on his view that the land in the after situation was enhanced by the lake only on a “ see ” and “ look ” basis. As explained above, the court has found that substantial ownership rights are still vested in the claimants. Therefore, the court again resorts to the State’s appraiser’s approach in order to find its after fair market value for the land.
For after value, the court considers the State’s appraiser’s Sales 228, 229, 234 and 309 and for reference and information purposes, his Sales 224 and 226.
*541 With respect to his Sale 228, the court finds that his adjustment from $170 per acre to $500 per acre to the subject property, after the easement appropriation, is too high, and that such adjustment should have been to $350. The court then goes to his Sale 229 and finds that the subject property in the after situation was comparable to the sale property at $340 per acre, even with the easements imposed thereon, and finds that an adjustment to $350 per acre would be appropriate. With respect to his Sale 234, his adjustment to $500 was too high — a proper adjustment would be to $350. The court also refers to this appraiser’s Sale 309 and finds that his adjustment to $500 is not merited and that the sale supports a $350 per acre valuation, with the favorable size of the subject lake offsetting to some extent the easements imposed on the subject lake and related property.
The court refers to his Sales 224 and 226 for reference and information purposes only. Such sales represent a situation including a lake subject to water rights.
Based on the State’s appraiser’s approach, the court finds that the after fair market value of the claimants’ lands, as subject to the State’s easements, was $350 per acre. For the Garland claim and their 79.831± acres, the court computes this to produce an after value of $27,950 rounded; with respect to the Knaust claim and their 78.419 ± acres, the court computes this to produce an after value of $27,445 rounded. Again, based on a consideration of 99 ± acres of “ dry ” land, these dollar amounts compute out to $560± per “dry” acre. The court notes that its after value is below that of the State’s appraiser, but believes it has adequately explained why (Pilon v. State of New York, Claim No. 40910, remitted for further proceedings 25 A D 2d 697, supplemental decision dated Aug. 26, 1966, affd. 26 A D 2d 909).
The differences between before and after fair market values are as follows, with the court deducting $485 for maintenance of the dam as computed by the State’s appraiser:
GASLANT) CLAIM:
Before fair market value of land........... $47,900
After fair market value of land............ 27,950
Gross damage......................... 19,950
Less benefit for dam maintenance...... 485
$19,465
*542 Direct damage 32.676± acres subject to permanent easements at $250 per acre rounded .............................. $ 8,170
Indirect damage rounded................. 11,780
Less benefit ......................... 485
Net indirect damage.................... $11,295
KNAUST CLAIM:
Before fair market value of land........... $47,050
After fair market value of land............ 27,445
Gross damage......................... $19,605
Less benefit for dam maintenance...... 485
$19,120
Direct damage 27± acres subject to permanent easement at $250 per acre........... $ 6,750
Indirect damage rounded................. 12,855
Less benefit ......................... 485
Net indirect damage.................... $12,370
3. The court adopts the State’s appraiser’s $2,884 consequential damage to buildings and ground improvements in the Garland claim and his $2,970 consequential damage to buildings and ground improvements in the Knaust claim.
4. The court totals its awards as follows:
GARLAND CLAIM: .
Direct damage rounded................... $ 8,170
Indirect damage to land................... 11,295
Indirect damage to buildings and ground improvements rounded................. 2,885
Total............................... $22,350
KNAUST CLAIM:
Direct damage .......................... $ 6,750
Indirect damage to land rounded........... 12,370
Indirect damage to buildings and ground improvements ......................... 2,970
Total............................... $22,090
During the course of the trial the State made several motions addressed to the claimants’ appraisals. These were renewed at the close of claimants’ case. Decision was reserved. The court believes that in the text of this decision it has met the *543 issues raised by such motions and that its disposition thereof has thus been indicated and shown.
The claimants, Joseph T. and Virginia K. Garland, (Claim No. 50537), are awarded the sum of $22,350 for all damages direct and consequential, with interest thereon from February 16, 1968 to August 16, 1968 and from January 16, 1969 to the date of entry of judgment herein.
The claimants, Louise H. and Henry Knaust, Jr., (Claim No. 51020), are awarded the sum of $22,090 for all damages direct and consequential, with interest thereon from February 16,1968 to August 16, 1968 and from May 21, 1969 to the date of entry of judgment herein.